FILED
2015 Mar-19  PM 04:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| ANNIE JACKSON, | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | |
| v. | ) | CASE NO. 5:13-CV-1890-KOB |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Respondent. | ) | |

MEMORANDUM OPINION

I. INTRODUCTION

On April 5, 2010, the claimant protectively filed a Title II application for a period of disability and disability insurance benefits, alleging disability beginning May 21, 2009.  She claimed inability to work because of her right foot because of a work-related injury, nerve damage in her foot, heart problems, congestive heart failure, removal of one kidney following cancer, hypertension, depression, and severe irritable bowel syndrome. (R. 208).  The Commissioner denied the claim on August 3, 2010.  After filing a request for a hearing, the ALJ conducted a video hearing on August 19, 2011. (R. 20).

On February 16, 2012, the ALJ determined that the claimant was not disabled, as defined by the Social Security Act, from May 21, 2009, her alleged onset date, to the time of the hearing. (R. 26).  On September 16, 2013, the Appeals Council denied the claimant's request for review; consequently the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1).  The claimant exhausted her administrative remedies, and this

1

court has jurisdiction pursuant to 42 U.S.C. § § 405 (g) and 1383(c)(3). For the reasons stated

below, this court REVERSES and REMANDS the decision of the Commissioner.

## II. ISSUE PRESENTED

The issue before the court is whether substantial evidence supports the ALJ's discrediting

of the opinion of the claimant's treating physician Dr. Crouch.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited.  This court must

affirm the Commissioner's decision if the Commissioner applied the correct legal standards and

if substantial evidence supports his factual conclusions.  *See* 42 U.S.C. § 405(g); *Graham v.*

*Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir.

1987).

"No...presumption of validity attaches to the [Commissioner's] legal conclusions,

including determination of the proper standards to be applied in evaluating claims." *Walker*, 826

F.2d at 999.  This court does not review the Commissioner's factual determinations *de novo*.

The court will affirm those factual determinations that are supported by substantial evidence.

"Substantial evidence" is "more than a mere scintilla.  It means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402

U.S. 389, 402 (1971).

The court must keep in mind that opinions such as whether a claimant is disabled, the

nature and extent of a claimant's residual functional capacity, and the application of vocational

factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the

Commissioner because they are administrative findings that are dispositive of a case; i.e., that

would direct the determination or decision of disability."  20 C.F.R. §§ 404.1527(d), 416.927(d).

Whether the Plaintiff meets the listing and is qualified for Social Security disability benefits is a

question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence,

or substitute [its] judgment for that of the Commissioner."  *Dyer v. Barnhart*, 395 F.3d 1206,

1210 (11th Cir. 2005).  Thus, even if the court were to disagree with the ALJ about the

significance of certain facts, the court has no power to reverse that finding as long as substantial

evidence exists in the record to support it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the

[Commissioner]'s factual findings."  *Walker*, 826 F.2d at 999.  A reviewing court must not look

only to those parts of the record that support the decision of the ALJ, but also must view the

record in its entirety and take account of evidence that detracts from the evidence on which the

ALJ relied. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the

person cannot "engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  To make this determination, the

Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments
> set    forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?

(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled.

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

Absent a good showing of cause to the contrary, the ALJ must accord substantial or considerable weight to the opinions of treating physicians. *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988). The ALJ must credit the opinions of treating physicians over those of consulting physicians unless good cause exists for treating the opinions differently. *Lewis v. Callahan*, 125 F.3d 1436, 1440-41 (11th Cir. 1997). The ALJ may discount a treating physician's report when it is not accompanied by objective medical evidence or is wholly conclusory. *Crawford v. Commissioner*, 363 F.3d at 1159. Where the ALJ articulated specific reasons for failing to give the opinion of a treating physician controlling weight and those reasons are supported by substantial evidence, the ALJ commits no reversible error. *Moore v. Barnhart,* 405 F.3d 1208, 1212 (11th Cir. 2005).

## V. FACTS

The claimant was age 48 at the time of the administrative hearing and had achieved a high school education. She previously worked at Delphi Automotive where, in 2005, an accident degloved her right foot. After her injury, she continued working, but in 2007 she ended her full-time employment because of her foot condition. (R. 210-11). The claimant alleged in 2010 that she could not work because of her right foot injury, neuropathy in her right foot, hypertension, congestive heart failure, renal cancer, depression, and irritable bowel syndrome. (R. 203).

Although the record in this case contains numerous medical records relating to the claimant's alleged mental impairments, the sole issue upon which the court bases its reversal does not deal with those mental impairments.  As such, the court will not discuss all the specific facts in the record regarding the mental impairments.  Moreover, although the claimant presented medical evidence regarding her foot injury and alleged pain resulting from it, the court will focus the fact section on those facts in the record relating to Dr. Crouch and other doctor's treatment of the claimant's heart conditions and hypertension that do relate to the court's reasons for reversing the ALJ's decision.

*Physical Impairments*

On May 4, 2009, during a visit to her treating physician, Dr. Will Crouch, in Hartselle, the claimant's blood pressure registered high at 160/90.

Dr. David Drenning at the Heart Center in Huntsville evaluated the claimant on July 6, 2009 and determined that she had uncontrolled hypertension, kidney cancer, and an aortic aneurysm.  He admitted her to the hospital the following day for care of her aneurysm. (R. 503-506).

On July 6, 2009, Dr. Drenning treated the claimant's aortic aneurysm at the Huntsville Hospital.  A chest scan showed an aortic aneurysm of 6.4 centimeters; her blood pressure was initially 144/80 at the office visit on July 6 and then spiked to 170/70 on July 7 at the hospital; her pulse was in the 50s; and she had a murmur in the right and left mid sternal borders.  Dr. Drenning continued her medications in the hospital and gave her Labetalol intravenously to lower her systolic blood pressure to less than 140.   He also ordered a cardiac catherization that showed that the claimant had a large, aortic aneurysm; mildly depressed left ventricular systolic

function that slowed pumping of blood; moderate pulmonary hypertension without evidence of left-to-right shunt; mild mitral regurgitation causing the heart valve to not close properly. (R. 436-38)

On July 17, 2009 Dr. Drenning referred the claimant to Drs. Richard Clay, LeRoy Harris, Murthy Vuppala, Paul Taberaux, and Steven Cowart at the Huntsville Hospital to replace the ascending aortic aneurysm. After her surgery, the claimant became hypotensive and suffered ventricular tachycardia.  Her doctors prescribed her Vicodin, Aspirin, Coreg, Amiodarone, Lisinopril, Norvasc, Levaquin, Nexium, Lorazepam, and Prozac upon discharge; placed her on an ambulation program for exercise with an ultimate goal of two miles per day; mandated a low sodium diet; and gave her instructions to use five pound upper extremity weights.  The claimant could not lift, push, or pull any heavy things and could not drive without further doctor approval. Her doctors instructed her to maintain a low sodium diet. (R. 440-42).

On August 19, 2009, Dr. Richard Clay of the Huntsville Cardiothoracic Surgeons, P.C., conducted a post-operative evaluation of the claimant.  She reported no chest pain or shortness of breath; her blood pressure was 155/87; and her heart rate was 64. (R. 771). The claimant had a follow up appointment on September 16, 2009, when she again had no chest pain or shortness of breath; her blood pressure reached 153/90, and her heart rate and rhythm were regular.  Dr. Clay determined she had mild cardiomegaly stemming from a mild enlargement of the cardiac silhouette.  (459-61).

From April 13 to August 25, 2009, Dr. Crouch's notes indicate that the claimant's blood pressure was normal.  On September 24, 2009, the claimant's blood pressure was high at 142/68,

and Dr. Crouch encouraged her to stop smoking. (R. 551).  On October 26, 2009, he refilled her prescription for Prozac, and her blood pressure continued to be high at 148/90. (R. 770).

On October 20, 2009, Dr. Paul Taberaux at the Heart Center in Huntsville reevaluated the claimant for ventricular tachycardia, and the claimant's blood pressure registered high at 144/90. He noted she was recovering after hospitalization for repair of her aortic aneurysm and was asymptomatic of ventricular tachycardia.  Dr. Tabereaux determined that the claimant was asymptomatic of ventrical tachycardia since her hospital release.

On December 1, 2009, Dr. Drenning at the Health Center in Huntsville reported that the claimant's "[t]arget blood pressure is 130/80 or less."  At the visit, the claimant's blood pressure registered high at 158/86, and Dr. Drenning instructed her to stop Prozac and Trazodone because of their effects on her heart rhythm. (R. 472-500).

On December 7, 2009, her blood pressure was 132/82, and Dr. Crouch, at Dr. Drenning's request, began to wean the claimant off of Prozac, Trazodone, and Prilosec to help control her blood pressure.  However, he noted that, if her depression or anxiety increased, she should contact him immediately. (R.770)

On January 20, 2010, Dr. Drenning evaluated the claimant's blood pressure and indicated that her "[b]lood pressure is presently NOT well controlled on the current medical regimen."  He referred her to Dr. Tabereaux.  (R. 479) (capitalization in the original).

On January 25, 2010, the claimant saw Dr. Tabereaux at the Heart Center, and her blood pressure registered slightly high at 134/82.  Dr. Tabereaux decreased her Coreg prescription to increase her heart rate and prescribed Lisinopril-Hydrochlorothiazide to control her blood pressure.  (R. 490-502).  Dr. Tabereaux determined that the patient had no further symptomatic

episodes of ventricular tachycardia and a prolonged heart rhythm.  In his treatment notes, Dr. Tabereaux acknowledged that the claimant informed him that her past medical history included congenital heart failure (CHF), that he reviewed the past medical history, and that "no changes [were] required." (R. 474).

The claimant completed a cardiovascular questionnaire on April 19, 2010 at the request of the Disability Determination Service.  She indicated that she tried to walk around her yard a couple times a day for exercise, but could not walk in the heat because her medicine decreased her energy; that she walked for twenty minutes but she walked very slowly; that walking, standing, or sitting caused her discomfort because her foot swelled; and that she did not have much energy.  She reported that she continued to feel discomfort in her chest and left leg after her heart surgery and that Hydrocodone and Aleve relieved her discomfort.  The claimant said walking and moving also caused shortness of breath. (R. 243-244).

During a visit with Dr. Dino Ferrante at the Center for Colon and Digestive Disease in Huntsville on June 8, 2010, the claimant's blood pressure registered high at 147/82.

At the request of the Disability Determination Service, Jon G. Rogers, Ph.D., a clinical psychologist, evaluated the claimant on July 13, 2010.  During the evaluation, the claimant told Dr. Rogers that "'I take so much medication, I fell like a zombie.'" She also stated that her medication side effects impair her ability to function.  ( R. 725).

On July 14, 2010, Dr. Marlin Gill, a family practitioner, evaluated the claimant for the Disability Determination Service.  Her pulse was normal and her blood pressure was 130/80.  Dr. Gill determined that she had a history of hyperthyroidism, aortic aneurysm, and ventricular tachycardia. (R. 729-31).

On August 2, 2010, Lisa Mani conducted a physical residual functional capacity assessment on the claimant for the Disability Determination Service. At the time of the evaluation, the claimant's medications included Allegra, Coreg, Estradiol, Hydrocodone with APAP, Lisinopril, Lorazepam, Metamucil, Norvasc, Prozac, Acetylsalicylic Acid, and Synthroid. She informed Ms. Mani that she had a sedentary lifestyle but did light housework with the help of her boyfriend. (R. 98-103).

The claimant saw her treating physician, Dr. Crouch, numerous times throughout 2010 and 2011. On March 15, 2010, the claimant's blood pressure was high at 138/80. (R. 770). Despite her complaints of upper chest pressure, the claimant's blood pressure was normal at four appointments with Dr. Crouch from May 3, 2010 to August 26, 2010. (R. 766).

On August 31, 2010, Dr. Crouch assessed that the claimant's heart rate was elevated and her blood pressure was high at 150/80. On this same date, Dr. Crouch completed a physical functional assessment at the claimant's attorney's request. He found that the claimant could stand for thirty minutes at a time and for a total of three hours of an eight hour workday; could walk fifteen to twenty minutes and for a total of one to two hours out of an eight hour workday; and could sit for thirty to forty-five minutes at a time and for a total of four hours out of a regular workday. He indicated that the claimant needed a sit/stand option at her employment and that she needed to lie down two times a day for thirty minutes. The claimant reported that all of these activities caused her pain and made her foot swell.

Dr. Crouch reported that the claimant could frequently lift and carry five pounds citing "CHF" as a reason; had no limitations in talking or hearing; could frequently push and pull; had minor limitations in her right arm, her left arm, left leg, reaching, handling, and feeling; could

9

only occasionally use her right leg or kneel; could not balance, stoop, crouch, kneel, or crawl; could never work in an environment with exposure to fumes, odors, dust, gases, or poor ventilation; could not work in highly exposed places; and occasionally experienced work limitations in wet or humid environments, or environments with extreme heat or vibrations. (R. 752-53).

The claimant's blood pressure was normal at her appointments with Dr. Crouch on November 9, 2010 and December 6, 2010.  On January 6, 2011, the claimant's blood pressure was high at 148/70.  On January 13, her blood pressure was low at 100/60.  On January 25, 2011 her blood pressure was high at 140/78.  At three appointments with Dr. Crouch from February 8, 2011 to February 24, the claimant's blood pressure was normal; however, she claimed that she felt shortness of breath from any exertion.  She experienced weight gain, so Dr. Crouch recommended an exercise weight loss program, and she went to Curves.  (R. 757-760).

On February 16, 2011, Dr. Drenning, at the request of Dr. Crouch, evaluated the claimant at the Heart Center.  He determined that she had no symptomatic episodes of ventricular tachycardia.  Dr. Drenning noted her "hypotension on current medication regimen." (R. 761).  He decreased her Coreg prescription to 3.125 mg twice a day and advised her to keep a blood pressure log and to stop smoking. (R. 762).

On February 28, 2011, during her visit with Dr. Crouch, her blood pressure was 100/60, but registered as normal on April 11, 2011. (R. 757).

On June 27, 2011 and July 7, 2011 the claimant's blood pressure was  high at 140/90 and 150/92, respectively.  On July 7, Dr. Crouch increased her Coreg to 12.5 mg twice a day to help control her blood pressure.  (R. 757).

10

During a August 4, 2011 visit with Dr. Crouch, he noted that the claimant's blood pressure fluctuations caused her to feel weak. Dr. Crouch instructed the claimant to decrease her Coreg intake to one-half of a tablet on days she felt badly and encouraged her to drink more water. (R. 757).

On August 11, 2011, the claimant saw Dr. John Roberts at the Tennessee Valley Pain Consultants. Although the claimant's blood pressure at the time of this visit was 134/79, the nurse's notes for that visit reflect that the claimant's blood pressure had been up and down prior to that day and that the claimant reported that her pain medication was working well. Dr. Roberts indicated that the claimant's past medical history included "CHF," or congestive heart failure, and that he had reviewed the history and it required no changes. (R. 859).

On September 22, 2011, the claimant received a physical examination by Dr. Vijay Jampala of the Rheumatology and Arthritis Clinic at the request of the Disability Determination Service. At the appointment, her blood pressure was 130/80; her pulse was 78 beats per minute; she was alert; and she had a normal memory. Dr. Jampala determined that the claimant had a history of hypertension, headaches, spastic colon, chronic bronchitis, smoking, congestive heart failure, and right foot pain. She noted that the claimant had significant pain in her right foot. She determined that the claimant had a negative Romberg's sign. (R. 892-93).[1]

Dr. Jampala also assessed the claimant's ability to do work-related activities. Dr. Jampala assessed that the claimant could frequently lift ten pounds and frequently carry up to twenty pounds; sit for four hours; walk for one hour, stand for two hours, and sit for five hours in

---

[1] A negative Romberg's sign indicated no "loss of proprioceptive control in which increased unsteadiness occurs when standing with the eyes closed compared with standing with the eyes open." http://medical-dictionary.thefreedictionary.com/Romberg's+sign

a normal eight hour work day; and frequently operate foot controls with both her right and left feet.  Dr. Jampala found no impairments that affected the claimant's work-related activities that would last more than twelve months. (R. 892-92).

On September 29, 2011, at the request of the Disability Determination Service, the claimant saw Dr. Usha K. Nuthi, a neurologist.  At the visit, the claimant's blood pressure was 144/88.  Dr. Nuthi stated that the nerve conduction testing showed no evidence of neuropathy in the claimant's right lower extremity and that "she has no loss of strength, gait, or coordination which would limit function."  (R. 911-913).

*ALJ Hearing*

On August 19, 2011, the ALJ held a hearing to review the Social Security Administration's denial of disability benefits to the claimant.  The claimant testified that she was 50 years old and a high school graduate; lived in a one-story home with her boyfriend and niece; and had a driver's license and a car but did not drive often. (R. 51-52).

The ALJ then questioned the claimant about her prior Worker's Compensation claim. She said that she settled the claim, but that her foot swelled and prevented her from standing at her job after the accident.  She sated that she returned to work for one month after her Worker's Compensation settlement, but was unable to do her job because of her injury and being on Hydrocodone.  After leaving Delphi, the claimant said that she looked for a different job that did not require standing.  She found employment at the warehouse at GM.  However, she needed lighter work that did not involve standing, and GM did not have any available jobs that met that criteria. (R. 52).

The claimant reported that her condition was worse than it was at her previous disability hearing in 2009.  She indicated that her blood pressure was out of control; her foot still swelled and caused her pain; she smoked eight cigarettes a day and drank alcohol approximately once a week; and she took medication for her hypothyroidism, depression, hypertension, foot pain, allergies, and hormones.  She testified that the pain medication coupled with varying blood pressure rates prevented her from working.  The claimant also reported that her depression and stress levels had worsened since 2009. (R. 55-56).

When asked about her functional abilities, the claimant said that she could not lift a ten pound bag of sugar.  She testified that she could possibly walk for thirty minutes, but that, when she walked, her foot turned inward, worsened her pain, and swelled.  She climbed one step to enter her home but, otherwise could not walk up stairs.  She told the ALJ that she dressed, watched television, used a lighter, and tied her shoes. (R. 56-58).

The claimant reported that her pain averaged around a level of five to six, but at times could reach a level ten. (R. 57-58).  The claimant estimated that she would miss more than ten days of work because her medicine affected her attitude, energy, stress, and balance. (R. 58-59).  She said her doctors advised her to keep her blood pressure below 130, and she felt that working would negatively affect her blood pressure. (R. 62).  She also said that she could not work because her balance and poor memory caused her to fear for her safety and the safety of her coworkers.  She further alleged that her pain medication would prevent her from doing a job that required her to watch television monitors because she would lose concentration or go to sleep. (R. 65-66).

13

The claimant testified that she saw cardiologist Dr. David Drennen once a year and Dr. Will Crouch, her personal physician, at least once a month.  She said that Dr. Crouch had been her family doctor for her entire life. (R. 62-63).

The ALJ asked the claimant about Dr. Crouch's treatment.  She said he took her blood pressure and assisted other doctors in finding the right combinations and dosages of her medicines. (R. 65).

Patsy Bramlett, C.R.C., L.P.C., testified as a vocational expert.  Ms. Bramlett previously assessed the claimant in her Worker's Compensation claim in 2009.  She determined two of the claimant's jobs were relevant work history: an assembler, a medium, unskilled job with an SVP of 2; and a warehouse worker, a medium, unskilled job with an SVP of 1.  Despite her past relevant work, Ms. Bramlett testified that the claimant had no transferrable skills.

The ALJ posed a hypothetical question to Ms. Bramlett as to whether a person of the claimant's age, education, prior work history, and training, who could only occasionally lift twenty pounds, frequently lift ten pounds, and needed a sit or stand option, could return to the claimant's previous work.  Ms. Bramlett stated that a person with those limitations could not return to the claimant's previous work, but she indicated that such an individual could work as a finish inspector, unskilled, with 900 jobs available in Alabama and 48,000 nationally; a printed products assembler, unskilled, with 800 jobs in Alabama and 47,000 jobs in the nation; and a sorter, unskilled, with 500 jobs in Alabama and 30,000 jobs nationally. (R. 66-69).

Ms. Bramlett testified that frequent breaks and concentration deficiencies would prevent the claimant from maintaining employment and that the claimant could not miss more than ten days a month at any unskilled, light exertion job.

14

Ms. Bramlett then reviewed the limitations from Dr. Crouch's 2010 assessment.  From this assessment, Ms. Bramlett determined that the claimant was unemployable if she could only lift five pounds and had to take breaks or lie down frequently. (R. 66-73).

*ALJ Opinion*

The ALJ held that the claimant was not under disability within the meaning of the Social Security Act from May 21, 2009 to February 16, 2012.  He found that the claimant met the insurance requirements of the Social Security Act and had not engaged in substantial gainful activity since May 21, 2009, the alleged disability onset date.  The ALJ also determined that the claimant's severe impairments were right foot pain and neuropathy, history an aortic aneurysm, and an affective mood disorder. (R. 23).

The ALJ determined that the claimant's hypertension was not a severe impairment.  The ALJ noted that Dr. Crouch monitored the claimant's blood pressure; controlled her hypertension with medication; and did not record any functional limitations from her impairments in his records. (R. 24-25).

The ALJ found that the claimant's depression was not severe because her mental problems only minimally limited her functioning capacity.  The ALJ noted the absence of medical evidence of treatment by a psychological/psychiatric specialist and explained that the only mental health treatment the claimant received was when Dr. Crouch refilled her prescription for Prozac.

The ALJ concluded that the claimant had no severe physical impairment or combination of any physical or mental impairments that met the requirements of a listing impairment. (R. 25).

The ALJ assessed that the claimant had a history of hypertension and had an aortic aneurysm in July 2009.  He noted that a cardiac catherization showed minimal coronary disease and hypertension.  He reported that she had episodes of tachycardia in the hospital, but after her release she had no complaints of chest pain, shortness of breath, or any other heart problems.

The ALJ articulated that, after the hearing, Dr. Jampala conducted a rheumatology examination of the claimant and found that she had normal motor function in her lower right extremity.  The ALJ also indicated that Dr. Nuthi examined her right foot, found a negative NCV/EMG, and determined that the claimant had no loss of strength or coordination in her lower extremity that would significantly restrict her function. (R. 24-25).

Based on the record as a whole, the ALJ determined that the claimant had the residual functional capacity to perform light, unskilled work where she could sit and stand at will. Applying the pain standard, the ALJ found that her testimony about the intensity, persistence, and limiting effects of her symptoms was not credible because it was inconsistent with her residual functional capacity assessment.  He noted that the claimant testified that she could not work because of her injury; her condition had worsened since the last ALJ hearing; she had no energy, problems balancing, and increased stress; and her medications made her tired and prevented her from concentrating.

The first inconsistency with her testimony, noted by the ALJ, was that in 2006, after her work accident, she was released to return to work with the restrictions of light to medium exertional work with occasional stair climbing, walking, and balancing.  Yet, by 2008, the claimant's doctors saw no change in her limitations.  The ALJ determined that no evidence of deteriorating symptoms existed, but rather her symptoms demonstrated improvement.

16

The ALJ gave little weight to Dr. Crouch's functional assessment from 2010 because his own treatment records or any other medical evidence did not support his opinion; his opinion contradicted Dr. Jampala and Dr. Nuthi's consulting opinions; the claimant had no ongoing heart problems and was not diagnosed with congestive heart failure; he based his assessment on impairments for which he did not treat the claimant; and because he was only a "family physician." (R. 28).

The ALJ afforded more weight to Dr. Jampala's consulting physical examination because she accounted for the claimant's subjective complaints of pain within her report. However, the ALJ noted that, contrary to Dr. Jampala's report, no objective medical evidence existed that showed that the claimant could not stand or walk six hours out of the eight-hour work day. The ALJ gave Dr. Nuthi's evaluation that the claimant was not limited in function great weight because the medical record supported the finding. (R. 28).

Finally, the ALJ determined that the record did not corroborate the claimant's statements that her medication caused her to become tired and struggle to concentrate. He found no instance in the record where the claimant reported side effects from her medicine to treating physicians. The ALJ noted that she even told Dr. Roberts in August 2011 that her pain medications were "working well." The ALJ evaluated that the claimant's condition had improved rather than worsened since her last disability hearing. He opined that her daily activities were inconsistent with behaviors of someone who suffered disabling limitations. (R. 28-29).

The ALJ held that the claimant could not perform any past relevant work based upon the vocational expert's testimony and limitations in her residual functional capacity assessment. He also noted that the claimant had standing and sitting limitations that impeded her work ability.

17

He concluded, that given the claimant's residual functional capacity and based on the vocational expert's testimony, jobs existed in significant numbers that the claimant could perform, such as a finish inspector, printed products assembler, and a sorter.  Therefore, the ALJ found that the claimant was not entitled to disability benefits.  (R. 30-31).

## VI. DISCUSSION

*Whether substantial evidence supports the ALJ's discrediting of her treating physician Dr. Crouch's opinion.*

The claimant argues that the ALJ incorrectly rejected her treating physician Dr. Crouch's opinion regarding the limiting effects of impairments.  This court agrees that substantial evidence does not support the ALJ's discrediting of Dr. Crouch, specifically regarding the claimant's limiting effects of her hypertension.

The ALJ must accord substantial or considerable weight to the opinion of a treating physicians unless good cause exists for discrediting that opinion. *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988).  The ALJ may discount a treating physician's opinion if it is not accompanied by objective medical evidence or is wholly conclusory. *Crawford v. Commissioner*, 363 F.3d at 1159. If the ALJ cites reasons for discrediting the treating physical's opinion, but substantial evidence does not support his reasons, the ALJ commits reversible error.  *Moore v. Barnhart,* 405 F.3d 1208, 1212 (11th Cir. 2005).

The ALJ cited several reasons to support discrediting the treating physical Dr. Crouch's opinion regarding her functional limitations.  However, the court finds that substantial evidence does not support any of these reasons.

First, the ALJ stated that Dr. Crouch's functional assessment contradicted his treatment records.  The court disagrees. The ALJ does not point to any specific contradictions between his treatments notes and his assessed functional limitations.  Instead, the ALJ bases his finding on the fact that Dr. Crouch did not, in his treatment notes, specifically cite to the claimant's limitations.  Just because Dr. Crouch's treatment records do not specifically contain a functional limitation assessment within his notes does not mean that his ultimate assessment of her limitations contradicts his treatment notes.  Dr. Crouch could have based his 2010 functional assessment of the claimant on the information contained in his treatment notes.  His knowledge of the claimant's medical history, especially regarding her problems with her hypertension and the problems associated with uncontrolled high blood pressure, certainly would support Dr. Crouch's finding, in his professional medical judgment and after treating the claimant at least monthly for many years, that she had the functional limitations espoused in his assessment.

In fact, the ALJ's assessment that Dr. Crouch's records support that the claimant's hypertension was "controlled by medication" contradicts Dr. Crouch's treatment records. The ALJ stated that Dr. Crouch's records showed that he monitored her blood pressure and that her blood pressure was "controlled with medication" and that he did not state any functional limitation caused by her hypertension.  (R. 24).  The ALJ's analysis of the claimant's hypertension is incorrect and substantial evidence in the record does not support his conclusion.

Between March 2010 and July 2011, Dr. Crouch saw the claimant eighteen times and monitored her blood pressure at each visit.  Dr. Crouch's records indicate that the claimant's blood pressure experienced constant fluctuations.  On six visits, (March 15, 2010, August 31, 2010, January 6, 2011, January 25, 2011, June 27, 2011, and July 7, 2011) the claimant's blood

19

pressure was high, and it was low twice (January 13, 2011, February 28, 2011). (R. 757-70).  Dr. Crouch acknowledged that the claimant's continued blood pressure fluctuations caused her to experience the limitation of weakness, and he adjusted her Coreg prescription to try to help with this limitation.  (R. 757). Crouch referred the claimant to Dr. Drenning at the Heart Center because her blood pressure was uncontrolled.  Dr. Drenning changed the claimant's medication and told the claimant to keep a log of her blood pressure. (R. 762).  Even as late as September 2011, Dr. Nuthi's records indicate the claimant's blood pressure was uncontrolled at 144/88.

The court is unclear how the ALJ can conclude that the claimant's blood pressure was well-controlled with medication. Although Dr. Crouch's treating records do not indicate specific functional limitations, he did report that the claimant experienced weakness from her fluctuating, uncontrolled blood pressure, and this limitation could certainly support his functional limitations regarding lifting, lying down, sitting, and standing.

Moreover, the ALJ's other reasons for discrediting Dr. Crouch's functional assessment lack merit.  The ALJ claims that, because the claimant had no ongoing heart problems and had not been diagnosed with congestive heart failure, Dr. Crouch's functional limitations assessment is invalid.  However, the claimant did have ongoing problems relating to her heart—her uncontrolled hypertension.  Although she was asymptomatic for ventricular tachycardia relating to her heart rate, the record supports that her blood pressure was not controlled by medication and that Dr. Crouch's notes indicated that her blood pressure fluctuations caused the claimant to experience weakness.

Also, according to several doctors' records, the claimant had been diagnosed in the past with congestive heart failure. ( R. 474 and 859). Dr. Crouch's consideration of her history of congestive heart failure could support his functional limitation assessment of the claimant.

The ALJ also discredited Dr. Crouch's functional limitation assessment because it contradicted the assessments of Dr. Jampala and Dr. Nuthi, who were both consulting doctors and whose opinions the ALJ gave great weight. The ALJ's determination that Dr. Jampala and Dr. Nuthi's opinions were more credible than Dr. Crouch's evaluation is unfounded and unsupported by substantial evidence.

Both Dr. Jampala and Dr. Nuthi focused on the claimant's physical limitations caused by her right foot injury, not on the limiting effects of her fluctuating blood pressure or history of congestive heart failure. Moreover, both doctors evaluated the claimant *one* time. Dr. Crouch saw the claimant eighteen times in 2010 and 2011 and had been her general physician for many years. Based on his extensive knowledge of the claimant's medical history, his assessment was the only one that seemed to take into account the totality of her impairments.

The only other reasons the ALJ stated to discredit Dr. Crouch's functional limitation assessment was that Dr. Crouch's assessment was based on impairments for which he did not treat the claimant and that he was only a family physician. If the ALJ was referring to his treatment of the claimant's mental impairments, the court agrees that Dr. Crouch only prescribed Prozac to the claimant and had no speciality in the mental health field. However, even as a family practitioner, Dr. Crouch had sufficient medical knowledge to assess the claimant's physical impairments, monitor her blood pressure, and give his medical opinion about the

limitations caused by such impairments.  Moreover, Dr. Crouch had referred the claimant to other doctors he was working with to treat her.

The court finds that substantial evidence does not support the ALJ's failure to give great weight to the treating physician Dr. Crouch's functional assessment of the claimant's limitations. On remand, the ALJ should reassess whether the claimant's hypertension is a severe impairment given that it was not well-controlled with medication and thoroughly evaluate the claimant's functional limitations contained in Dr. Crouch's assessment that may have been caused by her hypertension.

Although the court has not addressed the other issues the claimant raised in her brief, the ALJ should reevaluate all of the issues in light of this opinion.

VII. CONCLUSION

For the reasons as stated, this court concludes that substantial evidence does not support the ALJ's decision and that it is due to be REVERSED and REMANDED.  The court will enter a separate order to that effect simultaneously.

DONE and ORDERED this 19th day of March, 2015.


_____
KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE

22